## ARNSTEIN v. PORTER.
### No. 169.

Circuit Court of Appeals, Second Circuit.

Feb. 11, 1946.

CLARK, Circuit Judge, dissenting.

Ira B. Arnstein, pro se.

Cohen, Cole, Weiss & Wharton, of New York City (Samuel J. Silverman, of New York City, and Joseph Good, Jr., of Brooklyn, N. Y., of counsel), for appellee.

Before L. HAND, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. Plaintiff with his complaint filed a jury demand which defendant moved to strike out. Defendant urges that the relief prayed in the complaint renders a jury trial inappropriate. We do not agree. Plaintiff did not ask for an injunction but solely for damages. Such a suit is an action at "law."[1] That it is founded solely on a statute does not deprive either party of a right to a trial by jury;[2] an action for treble damages under the Sherman Act is likewise purely statutory,[3] but it is triable at "law" and by a jury as of right.[4]

2. The principal question on this appeal is whether the lower court, under Rule 56,[4a] properly deprived plaintiff of a trial of his copyright infringement action. The answer depends on whether "there is the slightest doubt as to the facts." Doehler Metal Furniture Co. v. United States, 2 Cir., 149 F.2d 130, 135; Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967; Arenas v. United States, 322 U.S. 419, 434, 64 S.Ct. 1090, 88 L.Ed. 1363; Associated Press v. United States, 326 U.S. 1, 6, 7, 65 S.Ct. 1416; see discussion below, note 16. In applying that standard here, it is important to avoid confusing two separate elements essential to a plaintiff's case in such a suit: (a) that defendant copied from plaintiff's copyrighted work and (b) that the copying (assuming it to be proved) went so far as to constitute improper appropriation.

As to the first—copying—the evidence may consist (a) of defendant's admission that he copied or (b) of circumstantial evidence—usually evidence of access—from which the trier of the facts may reasonably infer copying. Of course, if there are no similarities, no amount of evidence of access will suffice to prove copying. If there is evidence of access and similarities exist, then the trier of the facts must determine whether the similarities are sufficient to prove copying. On this issue, analysis ("dissection") is relevant, and the testimony of experts may be received to aid the trier of the facts. If evidence of access is absent, the similarities must be so striking as to preclude the possibility that plaintiff and defendant independently arrived at the same result.

If copying is established, then only does there arise the second issue, that of illicit copying (unlawful appropriation.).[4b] On that issue (as noted more in detail below) the test is the response of the ordinary lay hearer; accordingly, on that issue, "dissection" and expert testimony are irrelevant.

In some cases, the similarities be-

---

[1] Pathe Exchange, Inc. v. Dalke, 4 Cir., 49 F.2d 161.

[2] Frazier v. New England Newspaper Pub. Co., D.C.Mass., 1 F.R.D. 734; Arnstein v. Twentieth Century Fox Film Corp., D.C.N.Y., 3 F.R.D. 58; Metro-Goldwyn-Mayer Distributing Corp. v. Fisher, D.C., 10 F.Supp. 745, 747; Universal Pictures Corp. v. Marsh, D.C., 36 F.Supp. 241, 242; cf. Mail & Express Co. v. Life Pub. Co., 2 Cir., 192 F. 899, 900-901; Brady v. Daly, 175 U.S. 148, 151, 160-161, 20 S.Ct. 62, 44 L.Ed. 109; Turner & Dahnken v. Crowley, 9 Cir., 252 F. 749, 753; Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 249, 23 S. Ct. 298, 47 L.Ed. 460.

Rule 1 of the Rules for Practice under § 25, adopted in 1909, see 17 U.S.C.A. following section 25 provided that the "rules of equity practice, so far as they may be applicable, shall be enforced * * *." This did not eliminate a jury trial where plaintiff sought no equitable relief. See Journal of Commerce & Commercial Bulletin v. Boston Transcript, D. C., 292 F. 311, 312; note that Mail & Express Co. v. Life Pub. Co., supra, and Turner & Dahnken v. Crowley, supra, were decided after 1909.

[3] United States v. Cooper Corp., 312 U. S. 600, 604, 61 S.Ct. 742, 85 L.Ed. 1071.

[4] Fleitmann v. Welsbach Co., 240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505; Meeker v. Lehigh Valley R. Co., C.C.N.Y., 162 F. 354, 357.

[4a] The Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, are applicable to copyright actions; see amendment, adopted June 5, 1939, to Rule 1 of Rules of Practice under § 25 of the Copyright Act.

[4b] See cases cited in note 18.

tween the plaintiff's and defendant's work are so extensive and striking as, without more, both to justify an inference of copying and to prove improper appropriation. But such double-purpose evidence is not required; that is, if copying is otherwise shown, proof of improper appropriation need not consist of similarities which, standing alone, would support an inference of copying.

Each of these two issues—copying and improper appropriation—is an issue of fact. If there is a trial, the conclusions on those issues of the trier of the facts—of the judge if he sat without a jury, or of the jury if there was a jury trial—bind this court on appeal, provided the evidence supports those findings, regardless of whether we would ourselves have reached the same conclusions.[4c] But a case could occur in which the similarities were so striking that we would reverse a finding of no access, despite weak evidence of access (or no evidence thereof other than the similarities); and similarly as to a finding of no illicit appropriation.

3. We turn first to the issue of copying. After listening to the compositions as played in the phonograph recordings submitted by defendant, we find similarities; but we hold that unquestionably, standing alone, they do not compel the conclusion, or permit the inference, that defendant copied. The similarities, however, are sufficient so that, if there is enough evidence of access to permit the case to go to the jury, the jury may properly infer that the similarities did not result from coincidence.

Summary judgment was, then, proper if indubitably defendant did not have access to plaintiff's compositions. Plainly that presents an issue of fact. On that issue, the district judge, who heard no oral testimony, had before him the depositions of plaintiff and defendant. The judge characterized plaintiff's story as "fantastic"; and, in the light of the references in his opinion to defendant's deposition, the judge obviously accepted defendant's denial of access and copying. Although part of plaintiff's testimony on deposition (as to "stooges" and the like) does seem "fantastic," yet plaintiff's credibility, even as to those improbabilities, should be left to the jury. If evidence is "of a kind that greatly taxes the credulity of the judge, he can say so, or, if he totally disbelieves it, he may announce that fact, leaving the jury free to believe it or not."[5] If, said Winslow, J., "evidence is to be always disbelieved because the story told seems remarkable or impossible, then a party whose rights depend on the proof of some facts out of the usual course of events will always be denied justice simply because his story is improbable."[6] We should not overlook the shrewd proverbial admonition that sometimes truth is stranger than fiction.

But even if we were to disregard the improbable aspects of plaintiff's story, there remain parts by no means "fantastic." On the record now before us, more than a million copies of one of his compositions were sold; copies of others were sold in smaller quantities or distributed to radio stations or band leaders or publishers, or the pieces were publicly performed.[6a] If, after hearing both parties testify, the jury disbelieves defendant's denials, it can, from such facts, reasonably infer access. It follows that, as credibility is unavoidably involved, a genuine issue of material fact presents itself. With credibility a vital factor, plaintiff is entitled to a trial where the jury can observe the witnesses while testifying. Plaintiff must not be deprived of the invaluable privilege of cross-examining the defendant[7]—the "crucial test of credibility"—in the presence of the

4c See point 5 below and the Appendix to this opinion.

5 Post v. United States, 5 Cir., 135 F. 1, 11. 70 L.R.A. 989; cf. Hastings v. Brooklyn Ins. Co., 138 N.Y. 473, 34 N.E. 289; Hemmens v. Nelson, 138 N.Y. 517, 34 N.E. 342, 20 L.R.A. 440; Walters v. Syracuse Rapid Transit R. Co., 178 N.Y. 50, 52, 70 N.E. 98; Heist v. Blaisdell, 198 Pa. 377, 48 A. 259, 262; Blumenthal v. Boston, etc., R. Co., 97 Me. 255, 260. 54 A. 747; Moore, Facts (1898) §§ 146, 147. 152, 170, 171, 173, 175.

6 Marston v. Dresen, 85 Wis. 530, 535, 55 N.W. 896. 899.

6a Even if it turned out that in part plaintiff falsified, that fact would not necessarily discredit his entire testimony, United States v. Greenstein, 2 Cir., 153 F.2d 550; Shecil v. United States, 7 Cir., 226 F. 184, 187.

7 See, e.g., Wigmore, Evidence, 2d Ed., 1936, § 1367; Moore, Facts (1898), § 1274; The Ottawa, 3 Wall. 268, 271, 18 L.Ed. 165; Sanborn, J., in Resurrection Gold Min. Co. v. Fortune Gold Min. Co., 8 Cir.,

jury.[8] Plaintiff, or a lawyer on his behalf, on such examination may elicit damaging admissions from defendant; more important, plaintiff may persuade the jury, observing defendant's manner when testifying, that defendant is unworthy of belief.[9]

To be sure, plaintiff examined defendant on deposition. But the right to use depositions for discovery, or for limited purposes at a trial,[10] of course does not mean that they are to supplant the right to call and examine the adverse party, if he is available, before the jury. For the demeanor of witnesses is recognized as a highly useful, even if not an infallible, method of ascertaining the truth and accuracy of their narratives. As we have said, "a deposition has always been, and still is, treated as a substitute, a second-best, not to be used when the original is at hand" for it deprives "of the advantage of having the witness before the jury."[11] It has been said that as "the appearance and manner of the witness" is often "a complete antidote" to what he testifies, "we cannot very well overestimate the importance of having the witness examined and cross-examined in presence of the court and jury."[11a] Judge Lumpkin remarked that "the oral testimony of the witness, in the presence of the Court and Jury, is much better evidence than his deposition can be

* * *"[12] Coxe, J., noted that "a witness may convince all who hear him testify that he is disingenuous and untruthful, and yet his testimony, when read, may convey a most favorable impression."[13] As a deposition "cannot give the look or manner of the witness: his hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration;" it "is * * * or it may be, the dead body of the evidence, without its spirit * * *"[14] "It is sometimes difficult and impossible to get so full, explicit, and perspicuous a statement of facts from the witness through a deposition as it is by his examination before court and jury."[15] "The right of a party, therefore, to have a witness subjected to the personal view of the jury, is a valuable right, of which he should not be deprived * * * except by necessity. And that necessity ceases whenever the witness is within the power of the court, and may be produced upon the trial."[15a]

With all that in mind, we cannot now say—as we think we must say to sustain a summary judgment—that at the close of a trial the judge could properly direct a verdict.[16]

 We agree that there are cases in which a trial would be farcical. If, in a

---

129 F. 668, 675, 676; Lee Sing Far v. United States, 9 Cir., 94 F. 834, 837.

[8] He would be so entitled if the trial were before a judge without a jury.

[9] "Sometimes a witness may be unimpeached as to general character, and may be uncontradicted either by others, or be perfectly consistent in his statement; and yet, from his deportment on the witness' stand, render himself unworthy of credit. A hesitating or confused manner, or a studied narrative of which a jury may judge from all that accompanies the delivery of the testimony, will justly cast a shade of doubt upon it all." United States v. Darton, 25 Fed.Cas.14,919, at page 770; Moore, Facts (1898) § 994.

[10] Rule 26(d).

[11] Napier v. Bossard, 2 Cir., 102 F.2d 467, 468-469. Of course, under the Rules, the deposition of an adverse party may be used "for any purpose," but it is not a compulsory substitute for his examination in open court.

[11a] Barron v. People, 1 N.Y. 386, 391.

[12] Hammock v. McBride and McBride, 6 Ga. 178, 183.

[13] Untermeyer v. Freund, C.C.N.Y., 37 F. 342, 343.

[14] Sir John Coleridge, in Atty. General v. Bertrand, 4 Moo.P.C.N.S. 460, 481.

[15] Pinson v. Atchison, T. & S. F. R. Co., C.C.Mo., 54 F. 464, 465. See also, Moore, Facts (1898), §§ 963, 967, 991–995; Osborn, The Mind of the Juror (1937) 96–98.

[15a] Brewer v. Beckwith, 35 Miss. 467, 472.

[16] See Sartor v. Arkansas Natural Gas Corporation, 321 U.S. 620, 624, 627, 64 S.Ct. 724, 88 L.Ed. 967; Arenas v. United States, 322 U.S. 419, 434, 64 S.Ct. 1090, 88 L.Ed. 1363; Doehler Metal Furniture Co. v. United States, supra; cf. Firemen's Mut. Ins. Co. v. Aponaug Mfg. Co., 5 Cir., 149 F.2d 359, 363; Griffith v. William Penn Broadcasting Co., D.C., 4 F.R.D. 475.

That the comment in the Sartor case is not to be restricted to the issue of damages is shown by Associated Press v. United States, 326 U.S. 1, 6, 65 S.Ct. 1416, 1418, where the court said, "We agree that Rule 56 should be cautiously invoked to the end that the parties may always be afforded a trial where there is a bona fide dispute of facts between them. Sartor

suit on a promissory note, the defendant, pleading payment, sets forth in an affidavit his cancelled check to the order of the plaintiff for the full amount due on the note and a written receipt in full signed by the plaintiff, while plaintiff in a reply affidavit merely states that he did not receive payment and suggests no other proof, then to require a trial would be absurd; for cross-examination of the defendant in such circumstances clearly would be futile.[17] But where, as here, credibility, including that of the defendant, is crucial, summary judgment becomes improper and a trial indispensable. It will not do, in such a case, to say that, since the plaintiff, in the matter presented by his affidavits, has offered nothing which discredits the honesty of the defendant, the latter's deposition must be accepted as true. We think that Rule 56 was not designed thus to foreclose plaintiff's privilege of examining defendant at a trial, especially as to matters peculiarly within defendant's knowledge. Illustrative of the dangers, in this respect, of summary judgments, if not cautiously employed, is a recent case in the court below. There the judge refused to grant summary judgment for defendants, despite a mass of impressive affidavits, containing copies of corporate records, the accuracy of which plaintiffs did not deny in their affidavits, and which on their face made plaintiffs' case seem nothing but a sham; at the trial, however, cross-examination of the defendants revealed facts, theretofore unknown by plaintiffs, that so riddled the defendants' case as it had previously appeared on the summary judgment motion that the judge entered judgment against them for several million dollars, from which they did not appeal.

We do not believe that, in a case in which the decision must turn on the reliability of witnesses, the Supreme Court, by authorizing summary judgments, intended to permit a "trial by affidavits," if either party objects. That procedure which, so the historians tell us, began to be outmoded at common law in the 16th century, would, if now revived, often favor unduly the party with the more ingenious and better paid lawyer. Grave injustice might easily result.

In the equity practice in the federal courts before 1912, extensive use had been made of deposition testimony. But Rules 46 and 47 of the Equity Rules of 1912, 28 U.S.C.A. § 723 Appendix, expressly provided that in "all trials in equity the testimony of witnesses shall be taken orally in open court" unless there was a "good and exceptional cause for departing from the general rule." The purpose was to ensure that the trial judge should have "the opportunity to see, hear and observe the actions of the witnesses." [17a] Surely the aim of present Rule 56 was not to restore in equity and introduce at "law" the old practices abolished in equity in 1912. That such was not the purpose appears from Rule 43(a) which provides that "the testimony of witnesses shall be taken orally in open court" except in unusual circumstances. Moore reports that this rule "has the obvious advantage of permitting the judge or jury to observe the appearance and demeanor of witnesses so as to determine more readily their veracity (or lack thereof) and

---

v. Arkansas Natural Gas Co., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967."

The Supreme Court in the Associated Press case also noted (326 U.S. at page 6, 65 S.Ct. at page 1418): "The court below in making findings and entering judgment carefully abstained from the consideration of any evidence which might possibly be in dispute," adding 326 U.S. at page 7, 65 S.Ct. at page 1418) that it would "consider the validity of the By-Laws and the contract exclusively on the basis of their terms and the background of facts which the appellants admitted." The Court also pointed out (326 U.S. at page 5, 65 S.Ct. at page 1417) how half-heartedly the appellants had objected to the use of a summary judgment, for they themselves asserted that such a judgment should have been entered in their favor.

[17] We do not mean by this illustration that Rule 56 is limited to suits for liquidated claims.

Thus summary judgment would have been proper in the instant case if plaintiff on his deposition had admitted that defendant had no access to plaintiff's compositions or had not copied any substantial and material part of them. Then the case would have been like Associated Press v. United States, 326 U.S. 1, 6, 65 S.Ct. 1416, 1418, i.e., the judgment would have been based solely upon the consideration of no evidence "which might possibly be in dispute."

[17a] Lane, The Federal Equity Rules, 46 Harv.L.Rev. (1933) 638, 651.

the weight to be given their testimony"; and states that "in the interest of oral testimony in open court, the use of depositions has been confined to situations that warrant departure from oral testimony."[17b] He writes that where it appears that "the moving party [if he be a plaintiff] has exclusive knowledge of the facts" the judge may deny a motion for summary judgment so that "the adverse party may be able to establish a defense if afforded the opportunity to cross-examine the moving party in court."[17c]

Moore discusses in detail the provision of Clause 5 of Rule 26(d) (3), that, where a witness, including a party, is alive, does not reside more than a hundred miles from the place of trial, is not unable to attend the trial—because of age, sickness, infirmity or imprisonment—and there is no inability to subpoena him, then it is only upon a showing "that such *exceptional circumstances exist* as to make it desirable, in the interest of justice and *with due regard to the importance of presenting the testimony of witnesses orally in open court*"[17d] that his deposition may be used. Moore says that the words we have italicized "are a warning that *this provision is not to be used as authority for trying cases generally upon depositions* in the manner in which all equity cases were tried prior to the adoption of the Equity Rules of 1912. In the Advisory Committee's Preliminary Draft there was a provision that a deposition could be used for any purpose at the trial 'if the parties affected thereby consent

thereto with the approval of the court.' This provision was dropped and the present provision was substituted therefor apparently because it was feared that the court would grant its approval whenever the parties consented to the use of depositions, and thereby to that extent nullify *the salutary rule that testimony of witnesses* shall *be taken orally in open court*."[17e]

If defendant, who resides in the district and within a few miles of the place of trial,[17f] should seek to substitute his own deposition for his testimony on the stand at the trial, he could not do so under clause 2 of Rule 26(d) (3),[17g] but would be obliged to show "exceptional circumstances" under clause 5. Consequently, mere business convenience prompting his absence would be insufficient; the use of his deposition would have to be justified as desirable "with due regard to the importance of presenting the testimony * * * orally in open court." But no such question is now before us. As no one has suggested that defendant is likely to be absent, we cannot, on the record in this appeal, assume that "exceptional circumstances" will exist when this case comes to trial; no facts appeared to the court below which made it proper for it to proceed on that assumption and to shut off the plaintiff from open-court examination of defendant.

 4. Assuming that adequate proof is made of copying, that is not enough; for there can be "permissible copying,"[18] copying which is not illicit. Whether (if he copied) defendant unlaw-

[17b] Moore, Federal Practice (1938) 3064, 3066.

[17c] Moore, ibid., 3189. Here Moore is referring to Rule 56(f). If there is impropriety in entering judgment on the grounds he mentions, it is surely not necessary that the adverse party set them forth in an affidavit, and certainly not here where he is a layman.

[17d] Emphasis added.

[17e] Moore, ibid., 2492, 2493; emphasis added.

[17f] The record shows that he resides in a hotel in New York City.

[17g] Clause 2 provides that a deposition may be used at the trial if "the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the United States, unless it appears that the absence of the witness was procured by the party offering the deposition." Moore suggests that the "unless" clause refers, not to absence from the

trial, but to absence from the territory within a radius of 100 miles from the place of trial. On that basis, he says that "a party who *resides* [italics his] more than 100 miles" distant has not "procured his own absence," and may therefore offer his own deposition. Whether that interpretation is correct we need not here consider. His discussion of this question (2460, 2461, 2492) nowhere intimates that the same would be true if, a party, a resident of the district and within the 100-mile zone, absented himself for business purposes.

[18] Dymow v. Bolton, 2 Cir., 11 F.2d 690, 692; Oxford Book Co. v. College Entrance Book Co., 2 Cir., 98 F.2d 688, 692; Eggers v. Sun Sales Co., 2 Cir., 263 F. 373, 375; Mathews Conveyer Co. v. Palmer-Bee Co., 6 Cir., 135 F.2d 73, 84–85; cf. Folsom v. Marsh, 9 Fed.Cas.No.4901, at pages 344, 345; Chatterton v. Cave, 3 A. C. 483; Macmillan Co. v. King, D.C., 223

fully appropriated presents, too, an issue of fact. The proper criterion on that issue is not an analytic or other comparison of the respective musical compositions as they appear on paper or in the judgment of trained musicians.[19] The plaintiff's legally protected interest is not, as such, his reputation as a musician but his interest in the potential financial returns from his compositions which derive from the lay public's approbation of his efforts.[20] The question, therefore, is whether defendant took from plaintiff's works so much of what is pleasing to the ears of lay listeners, who comprise the audience for whom such popular music is composed, that defendant wrongfully appropriated something which belongs to the plaintiff.[21]

Surely, then, we have an issue of fact which a jury is peculiarly fitted to determine.[22] Indeed, even if there were to be a trial before a judge, it would be desirable (although not necessary) for him to summon an advisory jury on this question.

We should not be taken as saying that a plagiarism case can never arise in which absence of similarities is so patent that a summary judgment for defendant would be correct. Thus suppose that Ravel's "Bolero" or Shostakovitch's "Fifth Symphony" were alleged to infringe "When Irish Eyes Are Smiling."[23] But this is not such a case. For, after listening to the playing of the respective compositions, we are, at this time, unable to conclude that the likenesses are so trifling that, on the issue of misappropriation, a trial judge could legitimately direct a verdict for defendant.

At the trial, plaintiff may play, or cause to be played, the pieces in such manner that they may seem to a jury to be inexcusably alike, in terms of the way in which lay listeners of such music would be likely to react. The plaintiff may call witnesses whose testimony may aid the jury in reaching its conclusion as to the responses of such audiences. Expert testimony of musicians may also be received, but it will in no way be controlling on the issue of illicit copying, and should be utilized only to assist in determining the reactions of lay auditors. The impression made on the refined ears of musical experts or their views as to the musical excellence of plaintiff's or defendant's works are utterly immaterial on the issue of misappropriation;[24] for the views of such persons are caviar to the general—and plaintiff's and defendant's compositions are not caviar.[25]

5. In copyright infringement cases cited by defendant,[26] we have sustained judgments in favor of defendants based on findings of fact made by trial judges after trials, findings we held not to be "clearly erroneous." There we did not attempt to pass on the veracity or credibility of wit-

---

F. 862, 863; 13 C.J. 1127–1128, 1132; 18 C.J.S., Copyright and Literary Property, §§ 105, 109.

[19] Where plaintiff relies on similarities to prove copying (as distinguished from improper appropriation) paper comparisons and the opinions of experts may aid the court.

[20] Cf. King Features Syndicate v. Fleischer, 2 Cir., 299 F. 533, 536; Falk v. Donaldson, C.C.N.Y., 57 F. 32, 37; Herbert v. Shanley, 242 U.S. 591, 594–595, 37 S.Ct. 232, 61 L.Ed. 511; Gross v. Van Dyk Gravure Co., 2 Cir., 230 F. 412, 413; Pellegrini v. Allegrini, D.C., 2 F.2d 611; Mathews Conveyer Co. v. Palmer Bee Co., 6 Cir., 135 F.2d 73, 85; Hanfstaengl v. W. H. Smith & Sons, [1905] 1 Ch. 519, 525, 528; Ernest Turner Electrical Instruments, Ltd. v. Performing Right Society, Ltd., [1943] Ch. 167, at pages 172, 174, 176. See 17 U.S.C.A. §§ 1(e) and 28 as to performance for "profit."

[21] See Arnstein v. Broadcast Music, Inc., 2 Cir., 137 F.2d 410, 411–412; Nichols v. Universal Pictures Corp., 2 Cir., 45 F.2d 119, 123; Dymow v. Bolton, 2 Cir., 11 F.2d 690, 692; Gorham Co. v. White,

14 Wall. 511, 528, 20 L.Ed. 731; Harold Lloyd Co. v. Witwer, 9 Cir., 65 F.2d 1, 18, 28; Kustoff v. Chaplin, 9 Cir., 120 F.2d 551, 559–560; Chatterton v. Cave, 3 A.C. 483, 492.

[22] It would, accordingly, be proper to exclude tone-deaf persons from the jury, cf. Chatterton v. Cave, 3 A.C. 483, 499–501, 502–504.

[23] In such a case, the complete absence of similarity would negate both copying and improper appropriation.

[24] Our comments in this paragraph would be pertinent if the trial were before a judge alone. Of course, a judge trying a case without a jury does not direct himself to enter a verdict; but the applicable standards are virtually the same, for he is then, in part, a one-man jury.

[25] Nor need plaintiff's be. See, e.g., Baker v. Selden, 101 U.S. 99, 102, 25 L.Ed. 841; see also cases cited in notes 20 and 21, supra.

[26] See, e.g., Arnstein v. Edward B. Marks Music Corporation, 2 Cir., 82 F.2d 275, 277; Arnstein v. Broadcast Music, Inc., 2 Cir., 137 F.2d 410, 412. See also the Appendix to this opinion.

474

nesses. To do so here would be to convert an appellate court into a trial court. The avowed purpose of those who sponsored the summary judgment practice was to eliminate needless trials where by affidavits it could be shown beyond possible question that the facts were not actually in dispute. In the attempt to apply that reform—to avoid what is alleged to be a needless trial in a trial court—we should not conduct a trial in this court. Where the facts are thus in real dispute, it is our function, after a trial in the lower court, to review its legal conclusions and, with reference to its findings of fact, to determine not whether we would ourselves have made them, but merely whether they rest on sufficient evidence in the record.[27] When the trial occurs before a judge without a jury, we have his findings of fact separated from his legal conclusions; when it occurs before a jury, our task is somewhat different, especially when the jury returns a general (i.e., composite) verdict.[28] But in reviewing a judgment after either type of trial, ours must be a limited function. This is not, and must not be, a trial court. Such a court has a duty more difficult and important than ours. We begin our task where it leaves off. Until the Supreme Court tells us that we err, we shall therefore adhere to the views stated in Doehler Metal Furniture Co. v. United States, supra,[29] and to our belief, expressed in Dellar v. Samuel Goldwyn, Inc., 2 Cir., 104 F. 2d 661, 662 and MacDonald v. Du Maurier, 2 Cir., 144 F.2d 696, that generally there should be trials in plagiarism suits.

 6. Plaintiff has not copyrighted two of his compositions, "Twilight Waltz" and "Duet" from "Song of David." Accordingly, the judgment to that extent should be changed to one of dismissal for lack of jurisdiction. The same is true of the judgment concerning the alleged copying of the titles of plaintiff's songs, "What Is Love" and "Night and Day." A title cannot be copyrighted.[30] The facts do not permit the joinder of these non-federal causes of action with the action for infringement of copyrights.[31]

 7. Defendant's motion papers showed that plaintiff had assigned his copyright to his composition "A Mother's Prayer" to another person. Plaintiff alleged that, by an oral agreement with the assignee, the copyright was to revert to plaintiff on the assignee's death, and that the assignee was dead. Defendant contended that the parol evidence rule barred proof of such an oral agreement, and that, therefore, plaintiff, not being able to show his ownership of the copyright, could not maintain suit for its infringement. Defendant asked the judge to take judicial notice of the record of another infringement suit in the same court, Arnstein v. American Soc. of Composers, D.C., 29 F.Supp. 388, involving the same issue as to the same composition, brought by plaintiff against another person, not in privity with the defendant here, in which decision on that issue had been adverse to plaintiff. On that ground, the judge held that the present action, so far as based on "A Mother's Prayer," must be dismissed. In so holding, the judge erred. As no one in the assignee's chain of title is a party to this suit, the parol evidence rule does not apply. The adjudication in the previous suit is entirely irrelevant.

 8. Defendant disregarded that sort of irrelevance in moving in the court below not only for summary judgment but also for dismissal of plaintiff's action as "vexatious." For in aid of that latter motion, defendant asked the judge to take judicial notice of five previous copyright infringement actions, including the one just mentioned above, brought by the plaintiff in the same court against other persons, in which plaintiff had advanced some legal arguments like those he advances here, and in which he had been defeated. The judge in his opinion referred to but one of those suits, Arnstein v. American Soc. of Composers, and purported not to pass on the motion to dismiss for vexatiousness. But in his order for final judgment he specifically referred to the "records" of the court in the five cases, naming them, as constituting in part the basis of the judgment.

---

[27] Even in admiralty, we give the usual weight to the findings of the trial court. Petterson Lighterage & T. Corp. v. New York Central R. Co., 2 Cir., 126 F.2d 992.

[28] We must then assume any possible finding of fact which would support the verdict. *A special verdict in the case at bar might well be desirable.*

[29] Cf. Drittel v. Friedman, D.C., 60 F. Supp. 999, 1004.

[30] Warner Bros. Pictures v. Majestic Pictures Corp., 2 Cir., 70 F.2d 310, 311.

[31] Zalkind v. Scheinman, 2 Cir., 139 F. 2d 895.

Defendant, in his brief in this court says, "This is perhaps the most significant" argument in "this case," and presses us to hold that affirmance of the dismissal should be based thereon. Coupled with this request is an implied suggestion that, with respect to the summary judgment, we should not so concern ourselves with fear of creating a "bad" precedent for the future that we reach an unjust decision in this particular case. With that suggestion we are in thorough accord.[32] We decide against summary judgment here because we consider it improper in this case. Our decision to that effect will have precedential significance only to the extent that, in any future case, summary judgment is sought when the facts are not beyond the range of actual dispute.

But, in the spirit of that suggestion, we regard it as entirely improper to give any weight to other actions lost by plaintiff. Although, as stated above, the judge in his opinion, except as to one of the previous actions, did not say that he rested his decision on those other suits, the language of his final judgment order indicates that he was probably affected by them.[33] If so, he erred. Absent the factors which make up res judicata (not present here), each case must stand on its own bottom, subject, of course, to the doctrine of stare decisis. Succumbing to the temptation to consider other defeats suffered by a party may lead a court astray; see, e.g., Southern Pacific Co. v. Bogert, 250 U.S. 483, 489, 39 S.Ct. 533, 63 L.Ed. 1099, note 1. When a particular suit is vexatious, sometimes at its conclusion the court can give some redress to the victorious party. Perhaps the Legislature can and should meet this problem more effectively. But we surely must not do so, as defendant here would have us do, by prejudging the merits of the case before us.[34]

Modified in part; otherwise reversed and remanded.

### Appendix

1. In the following cases, after a trial before a judge without a jury, the decision was for defendant because there was no copying, so that the issue of illicit copying was not reached. The judge found no access. On appeal the decision was affirmed for the following reasons: (a) The finding of no copying was supported by sufficient evidence so that it was not clearly erroneous. (b) The similarities were not sufficient to preclude coincidence since (1) there was no resemblance to the ear of the lay listener and/or (2) the plaintiff's contribution was too banal. Arnstein v. Edward B. Marks Music Corp., 2 Cir., 82 F. 2d 275; Darrell v. Joe Morris Music Co., Inc., 2 Cir., 113 F.2d 80; Arnstein v. Broadcast Music, Inc., 2 Cir., 137 F.2d 410, affirming, D.C., 46 F.Supp. 379.

2. In Wilkie v. Santly Bros., 2 Cir., 91 F.2d 978, affirming, D.C., 13 F.Supp. 136, after a trial before a judge without a jury, the decision was for plaintiff. On appeal, this decision was affirmed for the following reasons: Although there was no proof of access, the similarities, both to the ear and on analysis, were striking, and plaintiff's contribution was so unique that the trial judge's conclusion of absence of coincidence could not be reversed. Copying having been thus established, the trial judge's conclusion as to illicit copying was supported by enough evidence.

CLARK, Circuit Judge (dissenting).

While the procedure followed below seems to me generally simple and appropriate, the defendant did make one fatal tactical error. In an endeavor to assist us, he caused to be prepared records of all the musical pieces here involved, and presented these transcriptions through the medium of the affidavit of his pianist. Though he himself did not stress these records and properly met plaintiff's claims as to the written music with his own analysis, yet the tinny tintinnabulations of the music thus canned resounded through the United States Courthouse to the exclusion of all else, including the real issues in the case. Of course, sound is important in a case of this kind, but it is not so important as to falsify what the eye reports and the mind teaches. Otherwise plagiarism would be

---

[32] Cf. Aero Spark Plug Co. v. B. G. Corporation, 2 Cir., 130 F.2d 290, 295–297.

[33] Cf. MacDonald v. Du Maurier, 2 Cir., 144 F.2d 696, 701, as to the manner in which "a judge unconsciously" is affected by extraneous factors in "an infringement suit coming up in this way" i. e., on the pleadings and before trial.

[34] "That one reasonably may surmise that the plaintiff is unlikely to prevail upon a trial, is not a sufficient basis for refusing him his day in court with respect to issues which are not shown to be sham, frivolous, or so unsubstantial that it would obviously be futile to try them." Sprague v. Vogt, 8 Cir., 150 F.2d 795, 799, 801.

suggested by the mere drumming of repetitious sound from our usual popular music, as it issues from a piano, orchestra, or hurdy-gurdy—particularly when ears may be dulled by long usage, possibly artistic repugnance or boredom, or mere distance which causes all sounds to merge. And the judicial eardrum may be peculiarly insensitive after long years of listening to the "beat, beat, beat" (I find myself plagiarizing from defendant and thus in danger of my brothers' doom) of sound upon it, though perhaps no more so than the ordinary citizen juror—even if tone deafness is made a disqualification for jury service, as advocated.

Pointing to the adscititious fortuity inherent in the stated standard is, it seems to me, the fact that after repeated hearings of the records, I could not find therein what my brothers found. The only thing definitely mentioned seemed to be the repetitive use of the note e² in certain places by both plaintiff and defendant, surely too simple and ordinary a device of composition to be significant. In our former musical plagiarism cases we have, naturally, relied on what seemed the total sound effect; but we have also analyzed the music enough to make sure of an intelligible and intellectual decision. Thus in Arnstein v. Edward B. Marks Music Corp., 2 Cir., 82 F. 2d 275, 277, Judge L. Hand made quite an extended comparison of the songs, concluding, inter alia: " * * * the seven notes available do not admit of so many agreeable permutations that we need be amazed at the re-appearance of old themes, even though the identity extend through a sequence of twelve notes." See also the discussion in Marks v. Leo Feist, Inc., 2 Cir., 290 F. 959, and Darrell v. Joe Morris Music Co., 2 Cir., 113 F.2d 80, where the use of six similar bars and of an eight-note sequence frequently repeated were respectively held not to constitute infringement, and Wilkie v. Santly Bros., 2 Cir., 91 F.2d 978, affirming D.C.S.D.N.Y., 13 F.Supp. 136, certiorari denied Santly Bros. v. Wilkie, 302 U.S. 735, 58 S.Ct. 120, 82 L.Ed. 568, where use of eight bars with other similarities amounting to over three-quarters of the significant parts was held infringement.[1]

It is true that in Arnstein v. Broadcast Music, Inc., 2 Cir., 137 F.2d 410, 412, we considered "dissection" or "technical analysis" not the proper approach to support a finding of plagiarism, and said that it must be "more ingenuous, more like that of a spectator, who would rely upon the complex of his impressions." But in its context that seems to me clearly sound and in accord with what I have in mind. Thus one may look to the total impression to repulse the charge of plagiarism where a minute "dissection" might dredge up some points of similarity. Hence one cannot use a purely theoretical disquisition to supply a tonal resemblance which does not otherwise exist. Certainly, however, that does not suggest or compel the converse—that one must keep his brain in torpor for fear that otherwise it would make clear differences which do exist. Music is a matter of the intellect as well as the emotions; that is why eminent musical scholars insist upon the employment of the intellectual faculties for a just appreciation of music.[2]

Consequently I do not think we should

---

[1] In accord is Shafter, Musical Copyright, 2d Ed.1939, c. 6, particularly p. 205, where the author speaks of "the 'comparative method,' worked out by Judge Learned Hand with great success," and "his successful method of analysis," citing Hein v. Harris, C.C.S.D.N.Y., 175 F. 875, affirmed 2 Cir., 183 F. 107, and Haas v. Leo Feist, Inc., D.C.S.D.N.Y., 234 F. 105; and p. 194, where he approves of Judge Yankwich's course in attaching an exhibit of analysis to his opinion in Hirsch v. Paramount Pictures, Inc., D.C.S.D.Cal., 17 F.Supp. 816—"this sensible procedure," "a splendid model for future copyright decisions." I find nowhere any suggestion of two steps in adjudication of this issue, one of finding copying which may be approached with musical intelligence and assistance of experts, and another that of illicit copying which must be approached with complete ignorance; nor do I see how rationally there can be any such difference, even if a jury—the now chosen instrument of musical detection—could be expected to separate those issues and the evidence accordingly. If there is actual copying, it is actionable, and there are no degrees; what we are dealing with is the claim of similarities sufficient to justify the inference of copying. This is a single deduction to be made intelligently, not two with the dominating one to be made blindly.

[2] Thus Stewart Macpherson, Professor of Harmony and Composition in the Royal Academy of Music, says in his standard text, Form in Music, Rev.Ed.1930, 1, 2: "Music appeals to us in a threefold way, which may be described under the

abolish the use of the intellect here even if we could. When, however, we start with an examination of the written and printed material supplied by the plaintiff in his complaint and exhibits, we find at once that he does not and cannot claim extensive copying, measure by measure, of his compositions. He therefore has resorted to a comparative analysis—the "dissection" found unpersuasive in the earlier cases—to support his claim of plagiarism of small detached portions here and there, the musical fillers between the better known parts of the melody. And plaintiff's compositions, as pointed out in the cases cited above, are of the simple and trite character where small repetitive sequences are not hard to discover. It is as though we found Shakespeare a plagiarist on the basis of his use of articles, pronouns, prepositions, and adjectives also used by others. The surprising thing, however, is to note the small amount of even this type of reproduction which plaintiff by dint of extreme dissection has been able to find.

Though it is most instructive, it will serve no good purpose for me to restate here this showing as to each of the pieces in issue. As an example of the rest, we may take plaintiff's first cause of action. This involves his "A Modern Messiah" with defendant's "Don't Fence Me In." The first is written in 6/8 time, the second in common or 4/4 time; and there is only one place where there is a common sequence of as many as five consecutive notes, and these without the same values. Thus it goes. The usual claim seems to be rested upon a sequence of three, of four, or of five—never more than five—identical notes, usually of different rhythmical values. Nowhere is there anything approaching the twelve-note sequence of the Marks case, supra. Interesting is the fact that the closest tonal resemblance is to be found between a piece by defendant written back in 1930 and an uncopyrighted waltz by plaintiff (rejected here by my brothers because it is uncopyrighted) which was never published, but, according to his statement, was publicly performed as early as 1923, 1924, and 1925.

In the light of these utmost claims of the plaintiff, I do not see a legal basis for the claim of plagiarism. So far as I have been able to discover, no earlier case approaches the holding that a simple and trite sequence of this type, even if copying may seem indicated, constitutes proof either of access or of plagiarism. In addition to the cases already cited, see the fine statements of Bright, J., in Arnstein v. Broadcast Music, Inc., D.C.S.D.N.Y., 46 F.Supp. 379, 381, affirmed 2 Cir., 137 F.2d 410, supra, and of Yankwich, J., in Carew v. R. K. O. Radio Pictures, D.C.S.D.Cal., 43 F.Supp. 199. That being so, the procedure whereby the demonstration is made does not seem to me overimportant. A court is a court whether sitting at motion or day calendar; and when an issue of law is decisively framed, it is its judicial duty to pass judg-

---

headings of (i) Physical Sensation; (ii) Emotion, or feeling; (iii) Intellect (i.e. critical judgment, based upon certain reasoning powers within us). The first of these agencies, that of physical sensation, is without doubt the lowest of the three, and is one we share with the rest of the animal creation, upon whom—as we all know—certain sounds seem to have a distinct and immediate effect—often that of pain. * * * [The second] lies on a much higher plane than mere physical sensation. It is more subjective, and is the response of something in our own consciousness to some (often indescribable) quality in the music to which we are listening. * * * But, in judging of the emotional effect of a work, the factor of association has to be taken into account, and it is a truism to say that we are often tempted to estimate a poem or a musical work quite out of all proportion to its real value as a work of art, simply because it is associated, perhaps, in our thoughts with certain events or crisis in our own lives, or is the expression—probably the very imperfect expression—of some sentiment with which we are in sympathy and accord.

"Here then, in order that we may the better arrive at a just and critical appreciation of that to which we may be directing our attention, comes the necessity for the employment of the intellectual faculties of our nature. 'To judge a composition simply from the manner in which it works upon our feelings, is no better than judging a picture or a poem merely from our sympathy with its subject.' Sir Henry Hadow, Studies in Modern Music, Vol. II. We here are called upon to exercise our judgment, to decide upon such questions as style, symmetry, and balance of design—to say, in fact, whether the composer has put his thoughts into the most convincing shape, into that form which will best convey their meaning."

ment. Hence on the precedents I should feel dismissal required on the face of the complaint and exhibits.

But of course as the record now stands, the case is still stronger, for it appears that access must rest only upon a showing of similarities in the compositions. Under the procedure employed, the parties were entitled to require discovery of the case relied on by the other. Madeirense Do Brasil S/A v. Stulman-Emrick Lumber Co., 2 Cir., 147 F.2d 399, 405, certiorari denied 325 U.S. 861, 65 S.Ct. 1201; Rotberg v. Dodwell & Co., 2 Cir., 152 F.2d 100; Wilkinson v. Powell, 5 Cir., 149 F.2d 335; Piantadosi v. Loew's, Inc., 9 Cir., 137 F.2d 534; Fox v. Johnson & Wimsatt, Inc., 75 U.S.App.D.C. 211, 127 F.2d 729; 45 Col.L. Rev. 964, 967. This they did by each taking the deposition of the other, resulting in a categorical denial by defendant of having ever seen or heard plaintiff's compositions and no showing by plaintiff of any evidence of access worthy of submission to any trier of fact.[3] And I take it as conceded that these trifling bits of similarities will not permit of the inference of copying. My brothers, in a trusting belief in the virtues of cross-examination, rely upon a trial to develop more. But cross-examination can hardly construct a whole case without some factual basis on which to start. And they overlook, too, the operation of F.R. 26(d) (3) 2, as to the use of depositions, under which the defendant, if elsewhere on business, need not return for trial, but may rely upon his already clear deposition, and the plaintiff may not have the luxury of another futile cross-examination.[4] Further, my brothers reject as "utterly immaterial" the help of musical experts as to the music itself (as distinguished from what lay auditors may think of it, where, for my part, I should think their competence least), contrary to what I had supposed was universal practice, cf., e.g., Wilkie v. Santly Bros., Arnstein v. American Soc. of Composers, Authors and Publishers, and Carew v. R. K. O. Radio Pictures, all supra—thereby adding a final proof of the anti-intellectual and book-burning nature of their decision. Thus it seems quite likely that the record at trial will be the one now before us.

Since the legal issue seems thus clear to me, I am loath to believe that my colleagues will uphold a final judgment of

---

[3] Even his vague and reckless charge of burglary of his various rooming places—a repeated feature of his plagiarism cases, see, e.g., Arnstein v. American Soc. of Composers, Authors and Publishers, D.C.S.D. N.Y., 29 F.Supp. 388, 391, 392; Arnstein v. Twentieth Century Fox Film Corp., D. C.S.D.N.Y., 52 F.Supp. 114—upon cross-examination dissolved into nothing so far as this defendant is concerned.

[4] The opinion attempts to foreclose use of the depositions at the trial, even though we cannot now know or guess what circumstances will then develop; and in so doing, it indulges in a wholly strained and hampering construction of F.R. 26(d) (3). Centering attention on subpar. 5, the catchall provision giving general discretion to the district court, it stresses the reference there to "exceptional circumstances" and attempts to make that controlling. But obviously the more immediately pertinent provision is subpar. 2, under which a deposition may be used when the witness, including a party, "is" —not resides—"at a greater distance than 100 miles from the place of trial * * * unless it appears that the absence of the witness was procured by the party offering the deposition." Professor Moore shows that a party may properly take advantage of this provision without necessarily being charged with procuring his own absence. 2 Moore's Federal Practice 2460-2462, 2492. He gives as an example—and of course it is a natural one, suggested by the earlier decisions—the case of a party residing more than 100 miles from the place of trial; but it is a great injustice to his cogent argument to offer it as limiting the rule beyond its words to the one situation only. In view of the clear intent and purpose of the rule there would be no particular reason or sense in substituting a purely arbitrary restriction for the discretionary finding as to the purpose of the absence, required by the rule itself as a condition of exclusion. If a party is in the business of making motion pictures in California and is going about his normal business there when the trial occurs, it is quite clear that the exception limiting use of his deposition does not apply. That would probably have been the conclusion under the old statute, 28 U.S. C.A. §§ 639, 641, where the word "lives" was held to mean where the witness "can be found, and is sojourning, residing, or abiding for any lawful purpose," thus including going "to Asheville for his health." Mutual Ben. Life Ins. Co. v. Robison, 8 Cir., 58 F. 723, 732, 22 L.R.A. 325. But it is placed beyond dispute by the substitution in the rule of "is" for "lives." Forced construction of uniform rules to meet particular argumentative exigencies ought to be avoided.

plagiarism on a record such as this. The present holding is therefore one of those procedural mountains which develop where it is thought that justice must be temporarily sacrificed, lest a mistaken precedent be set at large. The conclusion that the precedent would be mistaken appears to rest on two premises: a belief in the efficacy of the jury to settle issues of plagiarism, and a dislike of the rule established by the Supreme Court as to summary judgments. Now, as to the first, I am not one to condemn jury trials (cf. Keller v. Brooklyn Bus Corp., 2 Cir., 128 F.2d 510, 517; Frank, If Men Were Angels, 1942, 80–101; Frank, Law and the Modern Mind, 1930, 170–185, 302–309, 344–348), since I think it has a place among other quite finite methods of fact-finding. But I should not have thought it pre-eminently fitted to decide questions of musical values, certainly not so much so that an advisory jury should be brought in if no other is available. And I should myself hesitate to utter so clear an invitation to exploitation of slight musical analogies by clever musical tricks in the hope of getting juries hereafter in this circuit to divide the wealth of Tin Pan Alley. This holding seems to me an invitation to the strike suit par excellence. But be that as it may, discussion as to the use of the jury in this case must surely be a premature obiter dictum which forgets that we are a court of review, not an administrative or judicial director of the trial courts. We are not even in a position to decide whether the case is properly on the jury list—a point not raised on this appeal or clarified in either records or briefs. Compare, as to the possible problems, Rifkind, J., in Bercovici v. Chaplin, D.C.S.D.N.Y., 3 F.R.D. 409. And surely we cannot now say that a verdict should not be directed, or an advisory jury or special verdict should be had. The first is a matter of law at the end of the case, to be decided in the light of the precedents above cited; the others are matters primarily within the discretion of the trial court. F.R. 39(c), 49(a).

The second premise—dislike of the summary-judgment rule—I find difficult to appraise or understand. Seemingly the pro-cedure is not to be generally favored, but with certain exceptions, the extent of which is unclear, e.g., United States v. Associated Press, D.C.S.D.N.Y., 52 F.Supp. 362, affirmed Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, a plaintiff's judgment, and Milcor Steel Co. v. George A. Fuller Co., 2 Cir., 122 F.2d 292, affirmed 316 U.S. 143, 62 S.Ct. 969, 86 L.Ed. 1332, a defendant's judgment in a patent case. And perhaps it is not to be employed at all in plagiarism cases. Since, however, the clear-cut provisions of F.R. 56 conspicuously do not contain either a restriction on the kinds of actions to which it is applicable (unlike most state summary procedures) or any presumption against its use, it is necessary to refashion the rule. This was announced by way of a dictum in Dochler Metal Furniture Co. v. United States, 2 Cir., 149 F.2d 130, 135, which was specifically directed as a criticism of another decision of this court, Madeirense Do Brasil S/A v. Stulman-Emrick Lumber Co., supra (cf., however, 45 Col.L.Rev. 964). Now that dictum is definitely accepted as the "standard here," without reference to the rule itself. That is a novel method of amending rules of procedure. It subverts the plans and hopes of the profession for careful, informed study leading to the adoption and to the amendment of simple rules which shall be uniform throughout the country. Worse still, it is ad hoc legislation, dangerous in the particular case where first applied and disturbing to the general procedure.[5]

In fact, however, cases, texts, and articles without dissent accept and approve the summary judgment as an integral and useful part of the procedural system envisaged by the rules. And as the Advisory Committee's two drafts of proposed amendments show, the demand is not for limitation, but for at least a small extension, of the rule. It is, indeed, more necessary in the system of simple pleading now enforced in the federal courts; for under older procedures, useless and unnecessary trials could be avoided, in theory at least, by the then existing demurrer and motion practice. But that stressed pleading forms, rather than

---

[5] I suggest that a case is not made out for such a departure from tried and approved rule-making procedure. It seems to rest upon somewhat vague references to "trial by affidavits," though this is precluded by the rule itself whenever there is a "genuine issue as to any material fact,"

F.R. 56(c), and to some anonymous case where seemingly the trial judge, being pressed to commit error, inconsiderately refused to do so. Had he committed error, the appellate courts and the Supreme Court would have been available for its correction; cf. note 6, infra.

the merits, while summary judgment and its popular correlative, pre-trial procedure, F.R. 16, go directly to the merits. One unfortunate consequence of eliminating summary procedure is that it affords support for the plea of return to the old demurrer, which, however clumsily, did get rid of some of the cases which did not deserve a protracted and expensive trial. Of course it is error to deny trial when there is a genuine dispute of facts;[6] but it is just as much error—perhaps more in cases of hardship, or where impetus is given to strike suits—to deny or postpone judgment where the ultimate legal result is clearly indicated. Plagiarism suits are not excepted from F. R. 56; and often that seems the most useful and direct procedure, since the cases so overwhelmingly turn ultimately and at long length upon an examination and a comparison of the challenged and the challenging compositions. Cf. MacDonald v. Du Maurier, 2 Cir., 144 F.2d 696, 701–703. Here I think we ought to assume the responsibility of decision now. If, however, we are going to the other extreme of having all decisions of musical plagiarism made by ear, the more unsophisticated and musically naive the better, then it seems to me we are reversing our own precedents to substitute chaos, judicial as well as musical.

---

[6] Except in one detail, not altogether the fault of the district judges, their use of summary judgment has been generally discriminating, not deserving the criticism in Doehler Metal Furniture Co. v. United States, 2 Cir., 149 F.2d 130, 135. Many of the cases there cited represent real and inevitable differences of legal view. That some other cases require reversal is not a disturbing experience in the shaking down into practice of a new rule, particularly when we note the detail above referred to, which has caused difficulty. That was the unfortunate and unperceived emphasis upon failure to state a claim for relief found in the grounds for the motion to dismiss, F.R. 12(b), which led some courts to place an undue emphasis upon pleading formalities. But this has already been corrected in the decisions, even without the amendment proposed by the Advisory Committee. Second Preliminary Draft of Proposed Amendments to Rules of Civil Procedure, May, 1945, Rule 12(b), and cases cited at pp. 14, 15.